## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**REGINALD R. McCUTCHEN, JR.,**

 **Plaintiff,**
**v.**

**DEKALB COUNTY SCHOOL DISTRICT,**

 **Defendant.**

**CIVIL ACTION FILE
NO. 1:19-CV-04956-VMC-JEM**

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Pending before the Court are Defendant's Motion for Summary Judgment, and Defendant's Amended Motion for Summary Judgment. The Court **RECOMMENDS** that Defendant's Motion for Summary Judgment, (Doc. 100), be **DENIED AS MOOT** because Defendant, with the Court's permission, later filed an amended version of the same motion.[1] (Docs. 116; 118). And for the reasons discussed below, the Court further **RECOMMENDS** that Defendant's Amended Motion for Summary Judgment, (Doc. 121), be **GRANTED.**

---

[1] The Court's order granting both parties five additional pages for their briefs, clarified that Defendant's amended motion for summary judgment would replace its previously filed motion in its entirety, and Plaintiff's amended response would replace his previously filed response in its entirety. (Doc. 118).

## I.    **BACKGROUND**

Plaintiff initiated this action pro se on November 1, 2019, and later filed first, second and third amended complaints. (Docs. 1; 5; 7; 40). After Plaintiff sought leave on August 18, 2020, to file yet another amended complaint, (Doc. 49), he obtained an attorney, who entered a notice of appearance on behalf of Plaintiff on September 3, 2020. (Doc. 52). The Court granted Plaintiff leave to file a counseled fourth amended complaint, but cautioned Plaintiff that he would not be granted leave to file a fifth. (Doc. 55). On October 26, 2020, Plaintiff, with counsel, filed the fourth amended complaint, which is the operative complaint. (Doc. 56).

The complaint contains four counts. (Doc. 56 at 9-17). In counts one and two, Plaintiff alleges violations of the Americans with Disabilities Act (ADA),[2] 42 U.S.C. §12101, *et seq.*, asserting that Defendant discriminated against him based on his disabilities (count one); and that Defendant retaliated against him for reporting, complaining of, and opposing Defendant's discriminatory practices and treatment (count two). (Doc. 56 at 9-14). In counts three and four, Plaintiff alleges violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. §2601, *et seq.*, asserting that Defendant interfered with Plaintiff's FMLA

_____

[2] Effective January 1, 2009, Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 (ADAAA), Pub.L. No. 110–325, 122 Stat. 3553. *See Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1267 (11th Cir. 2014). All references herein to the ADA, therefore, are to the Act as amended by the ADAAA.

rights (count three), and that Defendant retaliated against Plaintiff for exercising his FMLA rights (count four). (Doc. 56 at 14-17).

On November 9, 2020, Defendant filed a motion for partial dismissal of the operative complaint, arguing that Plaintiff's ADA claims went beyond the scope of his Equal Employment Opportunity Commission (EEOC) charge of discrimination because his employment termination occurred long after July 3, 2019, when he filed the EEOC charge; thus, his ADA claims had not been administratively exhausted. (Doc. 59). On June 29, 2021, the District Judge adopted the Report and Recommendation filed on April 8, 2021, granting the partial motion to dismiss in part, and denying it in part. (Docs. 70; 72). Neither party filed objections to the Report and Recommendation. (Doc. 72 at 5). The Court ruled that Plaintiff's claim for discriminatory termination under the ADA was dismissed for want of exhaustion, but that his claim for retaliatory termination under the ADA was not. (Docs. 70; 72). The Court held that because termination of employment is a discrete act of discrimination, not a continuing violation, the allegations of discriminatory conduct that predate Plaintiff's termination cannot anchor his claim of discriminatory termination. (Docs. 70 at 11-13; 72 at 6-7). But because new retaliation claims that occur after the filing of an EEOC charge are considered to grow out of the original discrimination itself and any protected activity taken in response to it, Plaintiff was not required to

file a new or amended EEOC charge to proceed on that claim.[3] (Docs. 70 at 11-13; 72 at 6-8).

The discovery period ended on January 20, 2022, (Doc. 85), with the exception of one outstanding discovery issue—Plaintiff's insufficient responses to seven interrogatories and the correlating document requests—that was resolved on June 17, 2022, when the Court ruled on Defendant's motion to compel and ordered Plaintiff to supplement his responses. (Docs. 88; 109; 111). Plaintiff provided the supplemental discovery responses on July 28, 2022, and the Court then granted the parties an extension of time to file amended briefs that incorporated the supplemental discovery. (Docs. 115; 116; 118). Defendant filed its amended motion for summary judgment on August 19, 2022, (Doc. 121), which has now been fully briefed, (Docs. 123; 124; 125), and is ripe for review.[4]

_____

[3] The Court found that, although Plaintiff asserted that he filed a second EEOC charge of discrimination, he had not provided any proof of a second charge, and in any event, Plaintiff had not shown or even claimed that he received a right to sue notice on a second charge of discrimination, which is required to assert a claim in federal district court. (Docs. 70 at 9-11 and n.5; 72). Also, the Court notes that Plaintiff filed the present civil action on November 1, 2019, (Doc. 1), which was well before his notice of employment termination on May 8, 2020, and actual termination on May 22, 2020. (Doc. 121-5 at 61). Thus, it appears that the July 3, 2019, EEOC charge, which is the only charge for which Defendant received a right to sue notice, could not have included any claim of discriminatory termination.

[4] As Defendant notes, Plaintiff's responses to the amended motion for summary judgment and statement of material facts, (Docs. 123; 124), were untimely. (Doc. 125 at 1 n.1). Plaintiff did not request an extension of time, but because the

## II.   **SUMMARY JUDGMENT STANDARD**

Summary judgment shall be granted when the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are the facts that "might affect the outcome of the suit under the governing law," and accordingly, "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant carries the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact," or the "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). If the movant fails to meet this initial burden, then the motion must be denied, and the Court need not consider any showing that the non-movant has made. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)(citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). But if the movant meets the initial burden, the burden then shifts to the non-movant to show that there is indeed a genuine issue of material fact, which precludes summary judgment. *Clark*, 929 F.2d at 608. The non-movant must "go beyond the pleadings" and present

_____

responses were filed only one day late, the Court grants a one-day extension, *nunc pro tunc,* August 30, 2022, and will consider the responses. *See* Fed. R. Civ. P. 6(b)(1)(A).

competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" in support of the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. In other words, when the movant has carried its initial burden under Rule 56(c), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (citations omitted). If the record taken as a whole could not lead a rational trier of fact to find for the non-movant, then there is no "genuine issue for trial." *Id*.

The Court must view the evidence and factual inferences in the light most favorable to the non-movant only if there is a "genuine" dispute as to those facts. *Scott*, 550 U.S. at 380; *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). To the extent that material facts are genuinely in dispute, the Court must resolve the disputes in the non-movant's favor. *Scott*, 550 U.S. at 380; *Vaughan v. Cox*, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003). If the record does not blatantly contradict the non-movant's version of events, the Court must determine whether reasonable jurors could find by a preponderance of the evidence that the non-movant is entitled to a verdict. *Scott*, 550 U.S. at 380 (when opposing parties tell two different stories, and one is blatantly contradicted by the record, so that no reasonable jury could believe it, then the Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment); *Anderson*, 477 U.S. at 252.

6

"A district court has broad discretion in determining the admissibility of evidence" on a motion for summary judgment. *See Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013)(evidentiary rulings are reviewed for an abuse of discretion)(citing *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1243 (11th Cir.2009)). In determining if evidence is admissible, the Court applies the same rules and standards that would apply to admissibility at trial. *Munoz v. Int'l All. of Theatrical Stage Emp. & Moving Picture Mach. Operators of U. S. & Canada*, 563 F.2d 205, 207 (5th Cir. 1977).[5] Generally, inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). In *Celotex*, the Supreme Court held that the nonmoving party is not required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment," which the Eleventh Circuit has interpreted "as simply allowing *otherwise admissible* evidence to be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)(emphasis in original)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). For example, a hearsay statement might be admissible because it falls within an exception to the hearsay rule, it does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or it is used solely for impeachment and

_____

[5] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit that were issued before October 1, 1981.

7

not as substantive evidence. *Macuba*, 193 F.3d at 1323-24. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012)(citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)(an affidavit "can be reduced to admissible form at trial" by having the affiant testify as a witness)). But the possibility that unknown witnesses will emerge to provide testimony, when the record contains no such indication, is insufficient to establish that the hearsay statement could be reduced to admissible trial evidence. *Jones*, 683 F.3d at 1294.

Affidavits and deposition testimony, as required by Rule 56, "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(4); *Macuba*, 193 F.3d at 1323 (the rule for affidavits applies to testimony given on deposition); *see also Joassin v. Murphy*, 661 F. App'x 558, 559 (11th Cir. 2016)(declarations based on personal knowledge are admissible summary judgment evidence); *Pritchard,* 92 F.3d at 1135. Unsworn statements, on the other hand, do not meet the requirements of Rule 56, and the Court will not consider them. *Dudley v. City of Monroeville, Ala.*, 446 F. App'x 204, 207 (11th Cir. 2011); *see also Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)(because the preliminary report submitted was without attestation, it had no probative value and properly was not considered by the district judge in ruling on the summary judgment motions)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17 (1970)).

8

### III.   **STATEMENT OF FACTS**

Unless otherwise indicated, the Court draws the following facts from Defendant's Amended Statement of Material Facts, (Doc. 121-2, DSMF); Plaintiff's Amended Response to Defendant's Statement of Material Facts, (Doc. 124 at 1-9, PRDF); Plaintiff's Statement of Additional Facts, (Doc. 124 at 10-13, PAMF); and Defendant's Response to Plaintiff's Statement of Additional Facts, (Doc. 125-1 at 1-9, DRPF).  As indicated, and as needed, the Court may draw some facts directly from the record. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record").

The Court deems admitted those facts submitted by Defendant that are supported by citations to record evidence, which Plaintiff has not specifically disputed and refuted with citations to admissible record evidence. *See* LR 56.1(B)(2)(a)(2), NDGA.[6] Accordingly, for facts submitted by Defendant that Plaintiff has not disputed with citations to record evidence, the Court accepts those facts as true, so long as the facts are supported by citations to record

---

[6] LR 56.1(B)(2)(a)(2), NDGA states:

This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).

evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 n.2 (N.D. Ga. Feb. 16, 2007). The Court has nevertheless viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

The Court has excluded any assertions of fact by either party that are immaterial, presented as arguments or legal conclusions, unsupported by a citation to admissible evidence in the record, or asserted only in a party's brief and not in the statement of facts. *See* LR 56.1(B)(1), NDGa; *see also* LR 56.1(B)(2)(b)(non-movant's statement of additional facts must also comply with LR 56.1(B)(1)). But the Court includes certain facts that are not necessarily material if they are helpful to present the context of the parties' arguments. The Court will not rule on each objection or dispute presented by the parties, and will discuss those objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.

### A.    Hiring and Essential Functions

Plaintiff applied for a position as a teacher at Tucker High School (THS) in 2018. (DSMF ¶9; PRDF ¶9). During his interview with the principal of THS, Dr. Eric Parker, and other THS administrators, Plaintiff's disabilities were not discussed. (DSMF ¶¶10-11; PRDF ¶¶10-11). Plaintiff was offered the teaching

position, and on August 7, 2018, he signed a contract for the 2018-2019 school year. (DSMF ¶12; PRDF ¶12). When Plaintiff started in Fall 2018, he taught geometry and a coordinate algebra support class, which is a remediation class providing assistance to students enrolled in coordinate algebra. (DSMF ¶13; PRDF ¶13). At that time, Plaintiff's classroom was an external trailer located outside the main school building. (DSMF ¶14; PRDF ¶14). The teaching day consisted of seven periods. (DSMF ¶15; PRDF ¶15). Plaintiff taught geometry during the second, fifth, sixth and seventh periods; he taught coordinate algebra support during fourth period; and he had planning during the first and third periods. (DSMF ¶15; PRDF ¶15). The teachers who taught geometry would regularly meet during the third period to plan course content together, and this type of meeting was commonly referred to as Professional Learning Communities (PLCs). (DSMF ¶¶16-17; PRDF ¶¶16-17). Three of Plaintiff's geometry classes—second, fifth and seventh periods—were designated as "collab" classes, meaning that Plaintiff had a co-teacher in his classroom—Erika Billups—who assisted the students who were on Individualized Education Plans (IEP). (DSMF ¶¶18-19; PRDF ¶¶18-19). Co-teachers were only assigned to classes that included IEP students. (DSMF ¶20; PRDF ¶20).

Dr. Parker also selected Plaintiff as the head coach of the track program—both the boys and girls teams—which is a position that only certified teachers can hold, and includes supplemental monetary compensation.[7] (DSMF ¶¶21-23,

_____

[7] A principal has discretion, with the approval of the athletics director, to hire coaches. (DSMF ¶24).

25; PRDF ¶¶21-23, 25). It is District policy, however, that an employee is not paid two supplemental payments for the same sport. (DSMF ¶25; PRDF ¶25). As head coach of the boys' track team, Plaintiff was paid $2,616.00, but in line with District policy, he was not paid any supplement for coaching the girls' track team. (DSMF ¶¶26-27; PRDF ¶¶26-27). As the track coach for both boys and girls, Plaintiff was responsible for doing everything for both teams, and he was required to attend all track meets and practices after school. (DSMF ¶¶28, 87; PRDF ¶28, 87). Track season starts in winter, but conditioning for the track athletes began in October. (DSMF ¶29; PRDF ¶29).

The performance expectations for teachers are provided in the THS handbook, which Dr. Parker distributed at the beginning of the school year. (DSMF ¶32; PRDF ¶32). The expectations include that teachers clock in every day in the front office by 7:40 a.m., to be at their classroom doors ready to receive students by 7:50 a.m., and that they clock out at the end of the day, which is 3:40 p.m. (DSMF ¶¶30-31; PRDF ¶¶30-31; Doc. 121-8 at 19-21). Jeans, jerseys, sweatshirts, and T-shirts are only allowed to be worn on designated Fridays, and tennis shoes are only allowed to be worn by P.E. teachers. (DSMF ¶¶40-41; PRDF ¶¶40-41). Staff meetings are held at least one Monday per month at 3:30 p.m., and teachers are asked not to plan activities, or schedule appointments, on the Mondays that would conflict with staff meetings. (DSMF ¶¶42-43; PRDF ¶¶42-43). The handbook further instructs that teachers are not to use the copy machine during class periods, but they can use the copy

machine before school, after school, or during their planning periods. (DSMF ¶45; PRDF ¶45).

Teachers are responsible for reporting expected absences through the District's web-based system, or by calling a specified phone number, and teachers with extra-curricular obligations are required to notify Dr. Parker of any absence. (DSMF ¶¶33-34, 44; PRDF ¶¶33-34, 44; Doc. 121-8 at 19-21). Teachers are further responsible for securing a substitute teacher, and if a substitute teacher cannot be secured, they are responsible for notifying an administrator. (DSMF ¶35; PRDF ¶35; Doc. 121-8 at 19-21). Teachers are required to have three days of emergency lesson plans prepared, and to leave the lesson plans in the classroom for substitute teachers. (DSMF ¶¶36-37; PRDF ¶¶36-37; Doc. 121-8 at 19-21). Lesson plans should also be placed in a folder on the door of the classroom, so that they are available to an observer, given that classroom observations are part of teacher evaluations. (DSMF ¶¶38-39; PRDF ¶¶38-39).

All general education teachers are expected to be able to fulfill the job description duties, essential functions, and qualifications of a general education teacher, as well as adhere to identified performance factors. (DSMF ¶46; PRDF ¶46). The District's job description for teachers provides that they are expected to work 190 days, attend professional learning sessions and/or required conferences, and perform general instruction coordination duties such as ordering materials, attending meetings, and engaging in various forms of correspondence. (DSMF ¶47; PRDF ¶47). The performance factors include the

ability to complete work tasks without being given procedure directions relative to work steps or the final project; the ability to establish priorities, simultaneously manage multiple tasks, and deliver a quality work product by a designated deadline; and the ability to be depended upon to report to work at the scheduled time. (DSMF ¶48; PRDF ¶48). Physical presence/attendance in the classroom, and clocking in and out on time are both essential functions for all teachers. (DSMF ¶¶49-50; PRDF ¶¶49-50).

### B.     Plaintiff's Performance—2018-2019 school year

On August 16, 2018, Plaintiff's direct supervisor, Assistant Principal Brittany Aarestad, had to email Plaintiff to remind him to submit his class syllabus and upload it to his class website. (DSMF ¶51; PRDF ¶51). She emailed Plaintiff again a couple of weeks later to remind him to input grades into his gradebook, and over the next couple of months, she emailed him several more times to remind him to input grades. (DSMF ¶¶52-53; PRDF ¶¶52-53). On November 8, 2018, Dr. Aarestad reminded Plaintiff that he needed to clock in daily because his last clock in was on September 21, 2018. (DSMF ¶54; PRDF ¶54). At that time, Plaintiff raised concerns about his ability to get to the front office to clock in, and then back to his outside trailer. (DSMF ¶55; PRDF ¶55).

Dr. Aarestad's first walkthrough observation of Plaintiff, as his direct supervisor and primary evaluator, took place on October 25, 2018. (DSMF ¶¶56-58; PRDF ¶¶56-58). Dr. Aarestad evaluated Plaintiff based on the TKES (Teacher Key Evaluation System) standards, which is the evaluation system used statewide for teachers. (Docs. 121-6 at 17-19; 121-7 at 32:1-11). Dr. Aarestad

14

scored Plaintiff as a Level III on instructional planning, instructional strategies, positive learning environment, academically challenging environment, professionalism, and communication, but she noted that his lesson plans were not on the door and he needed to finish one of his bulletin boards.[8] (DSMF ¶¶59-60; PRDF ¶¶59-60). She reminded Plaintiff to make sure that his lesson plans were accessible. (DSMF ¶60; PRDF ¶60). Dr. Aarestad conducted a second walkthrough observation of Plaintiff on November 14, 2018. (DSMF ¶61; PRDF ¶61). At that time, she scored Plaintiff as Level III on positive learning environment and academically challenging environment, but as Level II on instructional planning and professionalism. (DSMF ¶¶62-63; PRDF ¶¶62-63). For instructional planning, Dr. Aarestad noted that Plaintiff failed to address certain non-negotiable items they had discussed, such as completing his second bulletin board and displaying the opening, work period, and closing portions of the lesson. (DSMF ¶64; PRDF ¶64). For professionalism, Dr. Aarestad instructed Plaintiff not to text on his phone while he was teaching and while students were in the classroom. (DSMF ¶65; PRDF ¶65). Dr. Aarestad also noted that Plaintiff was wearing a baseball cap while teaching, which they had previously addressed; Plaintiff left the classroom during the observation, leaving Dr. Aarestad to ask Ms. Billups why Plaintiff left; and Plaintiff was still not clocking in daily. (DSMF ¶¶66-67; PRDF ¶¶66-67). Indeed, Plaintiff had not clocked in

---

[8] The TKES standards evaluation system uses rating levels of Level I through Level IV. (Doc. 121-7 at 59:15-21). Level IV is the highest level, and Level I is the lowest level. (*Id.*). A rating of Level I or II indicates "support needed" for that teacher. (Doc. 121-7 at 60:3-5).

since November 9, 2018, the day after she last reminded him that he needed to do so. (DSMF ¶68; PRDF ¶68).

Dr. Aarestad met with Plaintiff on November 29, 2018, to discuss his second walkthrough observation, clocking in and out, professional dress, and overall expectations, and she sent a follow-up email recapping the conversation the next day. (DSMF ¶¶69-70; PRDF ¶¶69-70). Dr. Aarestad instructed Plaintiff to clock in by 7:40 a.m., to not wear a baseball cap during class, to not wear sweatsuits at school unless there was a track meet that day, and to not leave the classroom during an observation without first telling the observer. (DSMF ¶71; PRDF ¶71). Dr. Aarestad also suggested that Plaintiff try using manipulatives and technology to assist with student learning. (DSMF ¶72; PRDF ¶72).

Dr. Parker conducted Plaintiff's formative assessment on December 13, 2018, which is a longer walkthrough in which the assessor conducts a more extensive evaluation of all TKES standards. (DSMF ¶¶73-74; PRDF ¶¶73-74; Docs. 121-3 at 31; 121-8 at 3, ¶10). Dr. Parker scored Plaintiff as Level III on professional knowledge, instructional planning, instructional strategies, assessment strategies, assessment uses, and positive learning environment, but as Level II on differentiated instruction, academically challenging environment, professionalism, and communication. (DSMF ¶¶75-79; PRDF ¶¶75-79). For differentiated instruction, Dr. Parker noted that there were significant gaps in instruction during class because Plaintiff remained at his desk and did not attend to several students, there was no guided practice, and time was lost to sort out worksheets submitted without names on them. (DSMF ¶76). For

16

academically challenging environment, Dr. Parker noted that there was no rubric or directions provided, there was minimal information on the white board about the standards covered in the unit of instruction, instructional time was lost, and there was no closure to the lesson. (DSMF ¶77; PRDF ¶77). For professionalism, Dr. Parker noted some concerns that had been previously addressed, such as adhering to professional attire, failing to tell administration of absences, not attending multiple faculty and new teacher meetings, and coaching track practice on days he was not present at school. (DSMF ¶78; PRDF ¶78). For communication, Dr. Parker noted that, although communication with students and parents was not a concern, Plaintiff's absences and class coverage communication with administration and department colleagues was an ongoing issue. (DSMF ¶79; PRDF ¶79).

     Plaintiff's teaching schedule for the Spring 2019 semester changed slightly in that Plaintiff no longer had "collab" classes during fifth and seventh periods, but he still had a "collab" class and co-teacher for second period. (DSMF ¶¶80-82; PRDF ¶¶80-82). This change was made by Dr. Aarestad, who was responsible for class scheduling, after Ms. Billups asked to be moved to a different classroom.[9] (DSMF ¶83; PRDF ¶83). Dr. Aarestad granted Ms. Billups's request, and she changed the schedule to remove Ms. Billups from Plaintiff's classes. (Doc. 121-6 at 6, ¶¶23, 25).

-------------------

[9] Defendant's facts, undisputed by Plaintiff, initially indicated that Ms. Billups was the co-teacher for all three of Plaintiff's "collab" classes, (DSMF ¶¶18-19; PRDF ¶¶18-19), but later indicated that she was Plaintiff's co-teacher for only two classes—fifth and seventh periods. (DSMF ¶83; PRDF ¶83).

On January 25, 2019, Plaintiff met with Dr. Parker and Dr. Aarestad for his mid-year conference. (DSMF ¶100; PRDF ¶100). Dr. Aarestad's comments included that Plaintiff had "amazing data" and worked well in the geometry team, but that he needed to continue to work on clocking in on time, professionalism and communication. (DSMF ¶101; PRDF ¶101). At this meeting, Plaintiff was placed on a Performance Development Plan (PDP). (DSMF ¶106; PRDF ¶106). The PDP, which started on January 25, 2019, was projected to end on May 24, 2019, and the data would be reviewed at the end of the semester. (DSMF ¶108; PRDF ¶108). The PDP was targeted at improvement on TKES Standard 9–professionalism, and TKES Standard 10–communication. (DSMF ¶109; PRDF ¶109). For professionalism, Plaintiff was to work on coming to work on time and clocking out; he was not to return to coach track when he was absent from school, but he could return for professional development meetings; and he was to dress professionally, and attend faculty and new teacher meetings. (DSMF ¶110; PRDF ¶110). For communication, Plaintiff was to be responsible for communicating to the administration and the bookkeeper when he was going to be absent or late, and communicating with administration when he was absent from his classroom. (DSMF ¶111; PRDF ¶111). The PDP provided that the clock in report would be checked, faculty and new teacher meeting sign in sheets would be checked, and work would be submitted for a substitute teacher when Plaintiff was absent. (DSMF ¶112; PRDF ¶112). Plaintiff's salary and benefits were not impacted by the PDP. (DSMF ¶113; PRDF ¶113).

Also during this January 25th meeting, Plaintiff disclosed for the first time his two disabilities—Attention-Deficit Hyperactivity Disorder (ADHD) and Generalized Anxiety Disorder (GAD)—and how they affect him. (DSMF ¶¶102-103, 115; PRDF ¶¶102-103, 115; Doc. 121-6 at 29). Plaintiff had not mentioned the disabilities prior to the January 25, 2019, meeting, but he raised the issues at that time because his schedule had changed, and he no longer had a co-teacher for his classes. (DSMF ¶¶103-104; PRDF ¶¶103-104). Plaintiff explained that because of the sudden schedule change, he had issues with time, tasks and "things of that nature." (DSMF ¶105; PRDF ¶105). Plaintiff stated on the PDP that he accepted responsibility for his tardiness and the other items addressed, and that his ADHD and GAD cause him to miss important deadlines and day-to-day tasks at times, but that he planned to work with the administration, his doctor, and other support staff to establish a plan to help him meet the standards set for him. (DSMF ¶117; PRDF ¶117; Doc. 121-6 at 29).

After the meeting, Plaintiff provided to Dr. Parker and Dr. Aarestad a note from Plaintiff's healthcare provider—Charles Guillaume, PMHNP-BC,[10] at Life Healing Center—which was dated December 14, 2018. (DSMF ¶¶114-115; PRDF ¶¶114-115). The note stated that Plaintiff was being treated for ADHD and GAD, and that Mr. Guillaume recommended that Plaintiff receive "extra

---

[10] PMHNP-BC refers to a psychiatric mental health nurse practitioner, who is board certified, and though PMHNPs are not medical doctors, they share many of the responsibilities with psychiatrists in diagnosing and designing treatment plans for patients. *See https://www.wgu.edu/blog/psychiatric-nurse-practitioner-vs-psychiatrist2002.html#close.*

time to complete tests," but the note did not identify any other accommodations needed. (DSMF ¶¶115-116, 152; PRDF ¶¶115-116, 152; Doc. 121-3 at 52:4-7, 302).

On February 8, 2019, having received complaints from parents, Dr. Parker emailed Plaintiff with a list of concerns about the track program. (DSMF ¶88; PRDF ¶88). First, Dr. Parker informed Plaintiff that he needed the documentation Plaintiff had shared with parents at a recent track meeting about dues/payments, fundraising, student expectations, and schedules because Dr. Parker had not seen any of the information presented and he, therefore, could not respond to parents' inquiries. (DSMF ¶89; PRDF ¶89). Second, Dr. Parker requested details about an incident with another coach, and he informed Plaintiff that the District's rules required any community coaches or volunteer coaches to go through a proper vetting process, including undergoing a criminal background check and being approved by the principal and director of athletics. (DSMF ¶¶90-91; PRDF ¶¶90-91). Third, Dr. Parker asked Plaintiff to explain who was responsible for student supervision after practice because there was an issue with track students being on school grounds after practice with no adult supervision, and on February 7, 2022, Dr. Parker had stayed with the unsupervised students until 7:15 p.m. (DSMF ¶¶92-94; PRDF ¶¶92-94).

Plaintiff received a notice on February 26, 2019, that his contract offer for the 2019-2020 school year was delayed because Dr. Parker had requested additional time to make a final recommendation. (DSMF ¶118; PRDF ¶118).

On March 5, 2019, Plaintiff met with Dr. Parker and Dr. Aarestad to discuss a Letter of Direction, which had been written by Dr. Parker to document

20

some administrative concerns and bring them to Plaintiff's attention. (DSMF ¶¶120-121; PRDF ¶¶120-121). Those concerns included that in February 2019, Plaintiff missed the deadline to post grades, and he also missed, by two weeks, the deadline to submit track rosters to the District; Plaintiff was absent from work on days that he still coached track practice; and Plaintiff removed the school from a track competition without communicating that fact to the school administration. (DSMF ¶¶95, 122; PRDF ¶¶95, 122). The Letter of Direction asked that Plaintiff monitor his time and attendance, meet deadlines as requested, and proactively increase his communication with administration. (DSMF ¶123; PRDF ¶123). At this March 5th meeting, Plaintiff raised the issue of no longer having a co-teacher, stating that he wanted a co-teacher to assume some of the duties and responsibilities of the classroom, to help him with organization, and to cover his classroom when he needed to step out. (DSMF ¶124; PRDF ¶124). Plaintiff also asked about having his planning period moved from the first period to later in the day, but Dr. Aarestad responded that Plaintiff's attendance issues precluded assigning him a first period class. (DSMF ¶126; PRDF ¶126). The time clock report for the Spring 2019 semester that reflects Plaintiff's clock-ins and clock-outs showed that Plaintiff clocked in only 22 times, all of which were long after 7:40 a.m., and he clocked out only once. (DSMF ¶128; PRDF ¶128; Doc. 121-5 at 20). Plaintiff never reported that he was unable to clock in because of any attention issues; rather, he complained that the location of his classroom made it difficult for him to clock in and out. (DSMF ¶129; PRDF ¶129).

21

Dr. Aarestad made efforts to support Plaintiff with his performance issues by emailing him reminders about upcoming deadlines. (DSMF ¶134; PRDF ¶134). She conducted a walkthrough observation of Plaintiff on March 14, 2019, and she scored Plaintiff as a Level III on differentiated instruction and positive learning environment, but as a Level II on instructional planning and professionalism. (DSMF ¶¶130-133; PRDF ¶¶130-133). For instructional planning, Dr. Aarestad noted that Plaintiff's current lesson plans were not posted on the door, the posted materials had nothing to do with what Plaintiff was teaching in class, and the posted materials contained the wrong dates. (DSMF ¶131; PRDF ¶131; Doc. 121-6 at 30). For professionalism, Dr. Aarestad noted that a student who was not in Plaintiff's class missed over an hour of his/her class making copies and completing track-related tasks for Plaintiff. (DSMF ¶133; PRDF ¶133).

On March 15, 2019, Dr. Aarestad taught Plaintiff's fourth period class because a substitute teacher did not show up to cover Plaintiff's absence.[11]

---

[11] Plaintiff disputes this fact as inadmissible and unsupported by the evidence, though he does not state any grounds for inadmissibility, or provide any citations. (PRDF ¶135). In her sworn affidavit, Dr. Aarestad stated that "On March 14, 2019, Mr. McCutchen was absent. No substitute arrived to cover his classes, so I taught his 4th period class." (Doc. 121-6 at 7, ¶30). This fact is, therefore, supported by the evidence. Also, this declaration was based on Dr. Aarestad's personal knowledge, and it was limited to an event that she personally observed and took part in. (*Id.*). Thus, it is admissible summary judgment evidence. *See Joassin* 661 F. App'x at 559 (declarations based on personal knowledge are admissible summary judgment evidence). And although competing affidavits generally create a genuine issue of fact, here,

(DSMF ¶135). Dr. Aarestad sent Plaintiff an email later that day with her observations, which included that Plaintiff left no directions for the substitute, no lesson plans, and no attendance rosters. (DSMF ¶136; PRDF ¶136). On March 22, 2019, having been contacted by a parent who was upset about Plaintiff directly texting his daughter, a student on the girls' track team, Dr. Parker instructed Plaintiff that he was not to send, or reply to, any text messages with students directly. (DSMF ¶96; PRDF ¶96; Doc. 121-8 at 3-4, ¶¶13-14).

Dr. Aarestad conducted another walkthrough observation of Plaintiff on April 11, 2019, and she scored Plaintiff as a Level III in instructional planning, differentiated instruction and assessment uses. (DSMF ¶140; PRDF ¶140; Doc. 121-6 at 35-37). She did not score Plaintiff on any other standards on that date. (Doc. 121-6 at 35-37). Plaintiff received a contract for the 2019-2020 school year, on April 26, 2019, which he signed the same day. (DSMF ¶145; PRDF ¶145; Doc. 121-5 at 21-22).

———————————————

Plaintiff cites to no competing affidavit or other evidence that contradicts this fact, (PRDF ¶135); thus, he has not complied with Rule 56.1 *See Marques v. JP Morgan Chase N.A.*, No. 1:16-CV-1215-LMM-AJB, 2019 WL 2714504, at *3 n.4 (N.D. Ga. Jan. 3, 2019), report and recommendation adopted, No. 1:16-CV-1215-LMM-AJB, 2019 WL 2714503 (N.D. Ga. Feb. 26, 2019)(overruling Plaintiff's objection because Plaintiff "offere[ed] no refutation of Defendant's fact with any specific citation, nor does it state anything more than a general objection to admissibility and materiality," so Plaintiff "has not complied with Rule 56.1."). Accordingly, this fact is admitted.

On May 10, 2019, Plaintiff received an overall satisfactory score on his summative assessment, which is the TKES evaluation for the 2018-2019 school year, and was completed by Dr. Aarestad. (DSMF¶141; PRDF ¶141; Doc. 121-6 at 38-40). She scored Plaintiff as Level III in all categories except for professionalism and communication, which she scored as Level II. (DSMF ¶142; PRDF ¶142; Doc. 121-6 at 38-40). For professionalism, Dr. Aarestad noted that the last date he had clocked in was April 11, 2019, and that when he does clock in, it's often well after 8:00 a.m. (DSMF ¶143; Doc. 121-6 at 39). Dr. Aarestad also noted that Plaintiff was still wearing a baseball cap, despite both she and Dr. Parker having addressed it with him. (DSMF ¶144; PRDF ¶144; Doc. 121-6 at 39). For communication, Dr. Aarestad noted that Plaintiff needed to continue to communicate effectively with administration and department chairs. (Doc. 121-6 at 40).

At the end of the Spring 2019 semester, Dr. Parker determined that Plaintiff had not made sufficient progress on his PDP,[12] and it was extended

---

[12] Plaintiff disputes this fact as inadmissible and unsupported by the evidence, though he does not state the grounds for inadmissibility, or provide any citations. (PRDF ¶146). In his sworn affidavit, Dr. Parker stated that "At the end of the 2019 Spring semester, I determined that Mr. McCutchen has not made sufficient progress on his Professional Development Plan (PDP) and extended the PDP." (Doc. 121-8 at 4, ¶16). This declaration of fact was based on Dr. Parker's personal knowledge as Plaintiff's supervisor, and it was limited to his personal knowledge; thus, it is admissible. (*Id.*); *Joassin,* 661 F. App'x at 559. And Plaintiff cites to no competing affidavit or other evidence that contradicts this fact; thus, he has not complied with Rule 56.1. (PRDF ¶146); *Marques,* 2019 WL 2714504, at *3 n.4. This fact is admitted.

into the 2019-2020 school year. (DSMF ¶¶146-147; PRDF ¶147). On June 26, 2019, Dr. Parker notified Plaintiff that he would not be the coach of the girls' track team for the 2019-2020 school year. (DSMF ¶97; PRDF ¶97).

### C.    Plaintiff's Accommodation Requests and Accommodations

Plaintiff emailed Robin Goolsby in the Office of Legal Affairs—the District's contact for all ADA-related inquiries—on March 12, 2019, to request information about workplace accommodations for his ADHD and GAD. (DSMF ¶¶148-149, 153; PRDF ¶¶ 148-149, 153; Doc. 121-3 at 305). In the email, he stated that he was struggling with (1) missing details and losing items; (2) focusing on tasks; and (3) missing important deadlines and forgetfulness. (DSMF ¶150; PRDF ¶150; Doc. 121-3 at 305). Plaintiff also stated in the email that he had requested a co-teacher, and to change his planning period from first period to later in the day, but that no accommodations or support had been given to assist him. (DSMF ¶151; PRDF ¶151; Doc. 121-3 at 305). Plaintiff had not contacted Ms. Goolsby prior to March 12, 2019. (DSMF ¶153; PRDF ¶153).

When Plaintiff did not receive a response from Ms. Goolsby, he sent another email to her on June 27, 2019. (DSMF ¶¶154-155; PRDF ¶¶154-155; Doc. 121-3 at 320-321). Plaintiff then met with Ms. Goolsby on July 4, 2019, at which time Ms. Goolsby acknowledged that she had not responded to his first email because she had overlooked it. (DSMF ¶¶156-157; PRDF ¶¶156-157; Doc. 121-3 at 322). After that meeting, Mr. Guillaume completed a "Healthcare Provider's Certification of Medical Impairment" form for Plaintiff, which was dated July 11, 2019, and was received by the District's Office of Legal Affairs on July 23,

25

2019. (DSMF ¶¶159, 164; PRDF ¶¶159, 164; Docs. 121-3 at 346-348; 121-5 at 23-25). Mr. Guillaume opined that Plaintiff was substantially limited in any function that requires a sustained level of concentration, including preparing lesson plans, reviewing and grading documents, and coordinating duties, and that Plaintiff may require additional time to complete tasks. (DSMF ¶¶159-160; PRDF ¶¶159-160; Doc. 121-5 at 23-25). As for Plaintiff's expected recovery, Mr. Guillaume stated that they were "currently working on finding the right medication and dosage that will help improve concentration level." (Doc. 121-5 at 24). Plaintiff completed the "Employee Request for Accommodations on the Basis of Medical Impairment" form, which was dated July 15, 2019, and was received by the District's Office of Legal Affairs on July 23, 2019. (DSMF ¶¶158, 161, 164; PRDF ¶¶158, 161, 164; Docs. 121-3 at 334-335; 121-5 at 26-27). Plaintiff requested nine accommodations: (1) an end-of-day planning period; (2) a co-teacher; (3) breaks; (4) FMLA leave; (5) reminders; (6) additional time to complete tasks and paperwork; (7) alternate ways to clock in; (8) a copier/printer in his classroom; and (9) "one class prep," meaning one class for which to prepare content, not having to switch to a different content. (DSMF ¶¶162-163; PRDF ¶¶162-163; Docs. 121-3 at 373; 121-5 at 26).

On August 16, 2019, having received the submissions from Plaintiff and Mr. Guillaume, Ms. Goolsby prepared a draft ADA accommodation plan based on the documentation provided. (DSMF ¶¶172-173; PRDF ¶¶172-173). The plan outlined eight accommodations for Plaintiff: (1) Plaintiff shall be provided with a detailed written list of all duties, tasks, and assignments bi-monthly to ensure

that he remains timely with his responsibilities; (2) establish regularly scheduled meetings with superiors/or designee to facilitate clear communication and collaboration to ensure timely completion of tasks assigned; (3) allow Plaintiff additional time to complete tasks with prior approval of supervisor/or designee; (4) provide Plaintiff with desk calendar/organizer for easy access to his daily tasks; (5) Plaintiff shall be assigned a mentor and/or academic coach for the 2019-2020 school year; (6) allow Plaintiff to take frequent breaks;[13] (7) allow Plaintiff to contact Employee Assistance Program regarding solutions to any possible work stress; and (8) on the days when episodes are severe, Plaintiff should be granted intermittent leave through FMLA, following FMLA guidelines, as soon as practical. (DSMF ¶173; PRDF ¶173; Doc. 121-10 at 7-8). Ms. Goolsby explained the reasons that some of Plaintiff's requests were denied, averring that: (1) Plaintiff's request for a co-teacher was denied because a co-teacher is only for students with disabilities who have an IEP plan, it is not a support for other teachers, and it also was not indicated as a necessary accommodation in the documentation provided by Plaintiff's medical provider; (2) Plaintiff's requests for a printer/copier in his classroom and an alternate means to clock in were denied because they were not supported by the documentation provided by Plaintiff's medical provider; (3) Plaintiff's request for an end-of-day planning period was

---

[13] The plan noted that this accommodation would require Plaintiff to request assistance from coworkers on each side and across the hall from his classroom when he needs to leave his students unattended. (Doc. 121-10 at 7).

denied because it was not supported by the documentation provided by Plaintiff's medical provider, though Ms. Goolsby noted that the school administration nevertheless did provide this accommodation; and (4) Plaintiff's request for "one class prep" was denied because the class assignments were based on student enrollment, and the course load for the math department meant that all teachers had two class preps.[14] (DSMF ¶¶174-177; Doc. 121-10 at 3-4, ¶¶11-14).

Plaintiff sent Ms. Goolsby his proposed revisions to the plan on August 22, 2019, requesting that someone other than Dr. Parker or Dr. Aarestad act as his supervisor or designee because direct contact with them caused him anxiety; that he be assigned both a mentor and an academic coach for stress related issues, organization, and time management; that he get a printer/copier in his classroom; that he have planning periods for both sixth and seventh periods; and that he be allowed to teach only one class content, so that he did not have to prepare multiple lesson plans and supplemental material. (DSMF ¶¶178-182; PRDF ¶¶178-182; Doc. 121-3 at 373). Ms. Goolsby responded to Plaintiff on

---

[14] Plaintiff disputes these facts as inadmissible and unsupported by the evidence, though, again, he does not state any grounds for inadmissibility or provide any citations. (PRDF ¶¶174-177). These facts are supported by the sworn affidavit of Robin Goolsby, and they are admissible because they are based on Ms. Goolsby's personal knowledge, and limited to events she personally took part in. (Doc. 121-10); *Joassin*, 661 F. App'x at 559. Plaintiff cites to no competing affidavit or other evidence that contradicts these facts; thus, he has not complied with Rule 56.1. (PRDF ¶¶174-177); *Marques*, 2019 WL 2714504, at *3 n.4. These facts are admitted.

August 29, 2019, stating that Assistant Principal Lous Mair would serve as Plaintiff's immediate evaluator, but that Dr. Parker would still need to complete the summative evaluation as the principal, and she asked Plaintiff to identify someone in the building that he would be comfortable working with as a mentor. (DSMF ¶¶183-184; PRDF ¶¶183-184). Ms. Goolsby further responded that Plaintiff's medical documentation did not support his having a printer/copier in his classroom, or end-of-the-day planning, and that all teachers were responsible for preparing content for two types of classes. (DSMF ¶¶185-186; PRDF ¶¶185-186). Nevertheless, the schedule had been adjusted to accommodate Plaintiff, grouping his geometry classes together to help with the transition, and one of his planning periods was moved to the seventh period. (DSMF ¶¶182, 186-187; PRDF ¶¶182, 186-187; Doc. 121-3 at 373).

### D.    Plaintiff's FMLA Leave

Plaintiff applied for FMLA leave on July 25, 2019, requesting leave from July 29, 2019, through September 29, 2019. (DSMF ¶¶165-167; PRDF ¶¶165-167; Doc 121-3 at 352). The "Certification of Healthcare Provider" submitted stated that Plaintiff was to be treated from August 6, 2019, through August 31, 2019, at an intensive daily outpatient program. (DSMF ¶168; PRDF ¶168; Docs. 121-3 at 368; 121-5 at 29-31). Plaintiff's FMLA request was approved, to begin August 6, 2019, and end August 30, 2019, with a return to work date of September 3, 2019. (DSMF ¶169; PRDF ¶169; Doc. 121-8 at 77). But on August 22, 2019, Plaintiff submitted paperwork indicating that he was able to return to work on Monday,

August 26, 2019, and he returned to work on that date. (DSMF ¶¶170-171; PRDF ¶¶170-171; Doc. 121-8 at 79).

As also discussed below, on March 23, 2020, Plaintiff submitted paperwork, including a certification from his healthcare provider, for retroactive intermittent FMLA leave for the dates that he was absent during the 2019-2020 school year, and on March 24, 2020, the leave request was approved. (DSMF ¶¶226-227; PRDF ¶¶226-227; Doc. 121-5 at 56-59); *see also Infra*, Section III(E).

### E.   Plaintiff's Performance—2019-2020 school year

While Plaintiff was out on approved FMLA leave from August 6, 2019, to August 23, 2019, he filed a complaint with the Office of Audit Compliance, on August 14, 2019, alleging that his wearing a hat during class was an exercise of his First Amendment right of expression.[15] (DSMF ¶252; PRDF ¶252; Docs. 121-3 at 170:16-25–171:1-21; 121-3 at 454-456). Also during that time, the THS administration started receiving complaints from parents about the students not having a full-time math teacher. (DSMF ¶188; PRDF ¶188; Docs. 121-6 at 41; 121-8 at 81). At the end of the first month of the 2019-2020 school year, the course assignments were adjusted based on student enrollment, which is a process called "leveling" that occurs every year. (Doc. 121-8 at 6, ¶20). Based on this normal leveling process, Dr. Aarestad revised the schedule, adding an

---

[15] The complaint references his meeting with Dr. Aarestad on November 28, 2019, but at his deposition Plaintiff indicated that 2019 was a typo, and it should have said 2018. (Doc. 121-3 at 170:16-25–171:1-21).

algebra section and collapsing a geometry section, because there were more students enrolled in algebra than in geometry, and also, to ensure that all students were receiving instruction from a certified math teacher, she assigned Plaintiff's originally assigned classes to other teachers.[16]  (DSMF ¶¶189-191; Docs. 121-6 at 8, ¶¶35-37; 121-8 at 6, ¶21).

When Plaintiff returned to work early, on August 26, 2019, the administration was unprepared for his return, as they believed he would be out until September 2, 2019. (DSMF ¶192; PRDF ¶192). But after some adjusting, Plaintiff was assigned to teach analytic geometry during first and sixth periods; coordinate algebra during second, third and fifth periods; and he had planning during fourth and seventh periods. (DSMF ¶193; PRDF ¶193). During the 2019-2020 school year, Plaintiff's classroom was inside the main school building, not in an outside trailer. (DSMF ¶194; PRDF ¶194). But Plaintiff continued to clock in late or not at all, and he failed to clock out, as shown by the time clock report for July 29, 2019, through March 11, 2020. (Docs. 121-3 at 504; 121-5 at 55). Between August 26, 2019, the date Plaintiff returned to work, and March 11,

_____

[16] Plaintiff disputes these facts as inadmissible and unsupported by the evidence, though, again, he does not state any grounds for inadmissibility, or provide any citations. (PRDF ¶¶189-191). These facts are supported by the sworn affidavits of Dr. Aarestad and Dr. Parker, and they are admissible because the declarations are based on their personal knowledge, and limited to events they personally took part in. (Docs. 121-6 at 8, ¶¶35-37; 121-8 at 6, ¶21); *Joassin*, 661 F. App'x at 559. Plaintiff cites to no competing affidavit or other evidence that contradicts these facts; thus, he has not complied with Rule 56.1. (PRDF ¶¶189-191); *Marques*, 2019 WL 2714504, at *3 n.4. These facts are admitted.

2020, Plaintiff clocked in only 65 times, clocked in by 7:40 a.m. only 21 times, and he clocked out only once.[17] (*Id.*).

With the new schedule, Plaintiff was able to attend the PLCs for geometry during fourth period, but he was not able to attend the PLCs for algebra because it was during fifth period when he had class. (DSMF ¶196; PRDF ¶196). Other teachers similarly had more than one class content to prepare, and they could not attend each PLC because of their schedules. (DSMF ¶196; PRDF ¶196). Plaintiff wanted his schedule to be changed so that he could attend the algebra PLC during fifth period, but he also only wanted to teach geometry classes. (DSMF ¶¶197-198; PRDF ¶¶197-198). Plaintiff further complained that he was assigned a class of "lower students" after returning from FMLA leave, whereas he had "regular students" before, and he was concerned that teaching the low performing students would negatively impact his evaluation scores. (DSMF ¶¶199-200; PRDF ¶¶199-200). Over the following weeks, Plaintiff requested several additional changes to his ADA accommodation plan, and he requested that once the plan was finalized, he be reinstated as the head girls' team track coach and reinstated to his original classes prior to taking FMLA leave. (DSMF ¶201; PRDF ¶201). Plaintiff also requested that his 2018-2019 TKES evaluation scores be reviewed and adjusted, and that his PDP be voided. (DSMF ¶201; PRDF ¶201).

_____

[17] Excluding weekends and public holidays, the period of August 26, 2019, to March 11, 2020, is 132 days. *See https://www.timeanddate.com/date/ dateadd.html.*

On October 24-25, 2019, Syrenthia Bines-Truitt, an instructional coordinator for Region II, and Kristie Fountain from the professional development office, attended Plaintiff's class for a learning walk, which is not an evaluation, but is used for collaboration and to assess gaps in instruction. (DSMF ¶¶206-208; PRDF ¶¶206-208). Both noted that some required components of the lesson were not observed. (DSMF ¶209; PRDF ¶209). Also on October 25, 2019, Plaintiff filed a complaint with the Georgia Department of Education regarding the fact that he was not certified to teach his sixth period coordinate algebra class, which included several IEP students. (DSMF ¶250; PRDF ¶250; Doc. 121-3 at 129:23-25–130:1-3).

Plaintiff's ADA accommodation plan was finalized on November 12, 2019, but several of the accommodations outlined in the plan were taken care of prior to finalization, including providing Plaintiff with a desk calendar/organizer, a mentor and academic coach, a different supervisor, reminders about deadlines and tasks, access to the Employee Assistance Program, and FMLA leave if coordinated with the leave department. (DSMF ¶¶202-203; PRDF ¶¶202-203). Also, on November 18, 2019, Dr. Parker informed Plaintiff via email that another teacher would cover Plaintiff's class during algebra PLCs, so that Plaintiff could attend those. (DSMF ¶205; PRDF ¶205; Doc. 121-8 at 85).

In the Fall of 2019, when Plaintiff was absent, he often did not secure substitute teachers, so math department co-chairs had to teach his classes, and he did not leave assignments for his classes. (Doc. 121-8 at 7, ¶26). Plaintiff admitted that, on at least one occasion, he emailed an administrator about his

33

absence, which is not permitted under the handbook. (DSMF ¶259; PRDF ¶259). And throughout the year, Plaintiff also frequently missed the PLCs and afterschool faculty meetings.[18] (DSMF ¶221; Docs. 121-6 at 9, ¶39; 121-8 at 8, ¶30). On November 24, 2019, Plaintiff filed a complaint with the Department of Labor alleging that he was not reinstated back to his original teaching position after taking FMLA leave. (DSMF ¶251; PRDF ¶251; Doc. 121-3 at 450-453). The Department of Labor found no violation on Plaintiff's FMLA complaint. (DSMF ¶258; PRDF ¶258; Doc. 121-11 at 1-6).

Ms. Bines-Truitt and Ms. Fountain returned for another learning walk in Plaintiff's classroom on January 24, 2020. (DSMF ¶212; PRDF 212). Both again noted that several key components of the lesson were not observed, and Ms. Bines-Truitt noted that Plaintiff left the room during the lesson, which Plaintiff later acknowledged, stating that he left to make copies because he did not have enough. (DSMF ¶¶213-215; PRDF ¶¶213-215).

Plaintiff met with Dr. Parker and Mr. Mair about his PDP on February 7, 2020. (DSMF ¶216; PRDF¶216). At this meeting, Dr. Parker clarified that

---

[18] Plaintiff disputes this fact as inadmissible and unsupported by the evidence, though, again, he does not state any grounds for inadmissibility, or provide any citations. (PRDF ¶221). This fact is supported by the sworn affidavits of Dr. Aarestad and Dr. Parker, and is admissible because the declarations are based on their personal knowledge, and limited to events they personally took part in. (Docs. 121-6 at 9, ¶39; 121-8 at 8, ¶30); *Joassin*, 661 F. App'x at 559. Plaintiff cites to no competing affidavit or other evidence that contradicts this fact; thus, he has not complied with Rule 56.1. (PRDF ¶221); *Marques*, 2019 WL 2714504, at *3 n.4. This fact is admitted.

Plaintiff's PDP was still active, and had not ended last semester. (DSMF ¶217; PRDF ¶217; Doc. 121-8 at 88-89). They discussed Plaintiff leaving campus and leaving his students unattended, and Dr. Parker also provided Plaintiff with a calendar for February that had details of upcoming activities and meetings. (DSMF ¶¶218-219; PRDF ¶¶218-219). Plaintiff filed complaints with the District against Dr. Parker on February 17, 2020, and March 13, 2020, alleging that Dr. Parker provided false information to Plaintiff about his PDP. (DSMF ¶¶253-254; PRDF ¶¶253-254).

In early March 2020, Dr. Parker emailed Plaintiff about following proper protocol for absences and leaving campus, and in response, Plaintiff sent screenshots that showed that for four of the dates in question—February 6th, February 20th, March 2nd, and March 13th—he had input his leave as FMLA leave, despite not having the prior approval or paperwork, and not informing administration. (DSMF ¶¶224-225; PRDF ¶¶224-225; Docs. 121-3 at 508-509; 121-8 at 91). Plaintiff submitted paperwork on March 23, 2020, including a certification from his healthcare provider, for retroactive intermittent FMLA leave for the dates he was absent during the 2019-2020 school year, and on March 24, 2020, the leave request was approved. (DSMF ¶¶226-227; PRDF ¶¶226-227; Doc. 121-5 at 56-59); *see also Supra*, Section III(D).

On April 24, 2020, Dr. Parker gave a "non-renewal presentation" to the contract reviewing committee of District representatives, recommending that Plaintiff not receive a contract for the 2020-2021 school year. (DSMF ¶229; PRDF ¶229; Doc. 121-8 at 92-112). Plaintiff was notified on May 8, 2020, that the

Dekalb County School District would not renew his contract; thus, his employment with the District would terminate on May 22, 2020. (DSMF ¶230; PRDF ¶230; Doc. 121-5 at 61).

## IV.   DISCUSSION

### A.   Count One—ADA Failure to Accommodate

In count one of the complaint, Plaintiff alleges that Defendant failed to reasonably accommodate Plaintiff's disability, in violation of the ADA. (Doc. 56 at 9-12, ¶¶49-64). To establish a prima facie case under the ADA for a failure to accommodate, Plaintiff must show that: (1) he has a disability; (2) he was a "qualified individual," at the relevant time; and (3) he was subjected to unlawful discrimination because of his disability. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). Here, the parties do not dispute that Plaintiff satisfies the first prong—he has a disability within the meaning of the ADA. (Docs. 121-1 at 13; 123 at 7). Defendant asserts, however, that Plaintiff cannot satisfy prongs two and three. (Doc. 121-1 at 13).

### (i)   *Qualified Individual—Prong Two*

A "qualified individual" can perform the essential functions of the employment position in question, with or without reasonable accommodation. *Holly*, 492 F.3d at 1256; *Lucas*, 257 F.3d at 1255; *see also Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979)(a qualified person "is able to meet all of a program's requirements in spite of his handicap"). "An employer must provide reasonable accommodations for employees with known disabilities unless such

36

accommodations would result in undue hardship to the employer." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). An accommodation—a modification or adjustment to the work environment—is "reasonable" and necessary under the ADA, only if it enables the employee to perform the position's essential functions. *Holly*, 492 F.3d at 1256. If the individual cannot perform an essential function of the job, even with an accommodation, then by definition, he is not a "qualified individual," and is not covered under the ADA. *Holly*, 492 F.3d at 1256. The ADA does not require an employer to eliminate an essential function of a job, nor "to reallocate job duties in order to change the essential functions of a job," but it may require that an employer restructure a particular job by altering or eliminating one or more of its "*marginal* functions." *Holly*, 492 F.3d at 1256 (emphasis in original); *Earl*, 207 F.3d at 1367.

Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly*, 492 F.3d at 1257 (citing *Earl*, 207 F.3d at 1365). Whether or not a function is essential is evaluated on a case-by-case basis by examining multiple factors. *Holly*, 492 F.3d at 1258. The employer's judgment about which functions of a job are essential is entitled to substantial weight, and if an employer has prepared a written description before advertising or interviewing applicants for the job, that description is evidence of the essential functions of the job. *Holly*, 492 F.3d at 1257; *Earl*, 207 F.3d at 1365. But when considering the employer's judgment about essential functions, testimony from the plaintiff's supervisor, as well as the company's "official position" are considered. *Holly*, 492 F.3d at 1257. Other

37

factors to consider include: (1) the amount of time spent on the job performing the function; (2) the consequences of not requiring the incumbent to perform the function; (3) the terms of any collective bargaining agreement; (4) the work experience of past incumbents in the job; (5) the current work experience of incumbents in similar jobs; (6) if the reason the position exists is to perform the function; (7) if there are a limited number of employees available among whom the performance of the job function can be distributed; and (8) if the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function. *Holly*, 492 F.3d at 1259.

Here, it is undisputed that essential functions of the job for all teachers at THS included: (1) punctuality—clocking in and out on time; (2) regular attendance/physical presence in the classroom; and (3) having three days of emergency lesson plans prepared, and leaving the lesson plans in the classroom for substitute teachers, as well as securing a substitute teacher to cover absences. (DSMF ¶¶35-37, 49-50; PRDF ¶¶35-37, 49-50). In addition to the fact that these essential functions are undisputed, the record shows that Defendant placed a high priority on them, and the THS Handbook contained detailed policies for each. (Doc. 121-8 at 19-21). Indeed, the Handbook expressly stated that teachers are expected to be on duty between 7:40 a.m. and 3:40 p.m. unless excused by the Principal or Assistant Principal, and that "**Scanning in and scanning out is NOT optional, it is MANDATORY.**" (Doc. 121-8 at 19)(emphasis in original). The nature of Plaintiff's job provides further support that these are essential functions. "[U]nlike other jobs that can be performed

without regard to a specific schedule, the tasks of [a teacher] by their very nature must be performed daily at a specific time." *Earl*, 207 F.3d at 1361. And certainly, regular attendance/physical presence in the classroom is essential so that students are not left unsupervised. "Regular attendance and punctuality are essential functions of the job of a teacher. When a teacher is late or absent a substitute teacher must be found. The work of a teacher cannot merely be done after hours, or off site. Much of the work requires face to face interaction with, and regular supervision of, children." *Mills v. Birmingham Bd. of Educ.*, No. CV 03-AR-3087-S, 2005 WL 8158200, at *5 (N.D. Ala. July 27, 2005). "Because the tasks are of a kind which must be done at a certain time and at a certain location, regular and timely attendance at work are essential functions of the job of a teacher." *Mills*, 2005 WL 8158200, at *5; *Kurek v. N. Allegheny Sch. Dist.*, 233 F. App'x 154, 158 (3d Cir. 2007)(finding that working a 7-3/4 hour workday was an essential function of teacher's job in part because unavailability of teacher increased other teachers' workloads, and teacher presence on-site is essential to ensure that sufficient staff is available should an emergency occur); *Holmes v. Fulton Cnty. Sch. Dist.*, No. 1:06-CV-2556-CC-AJB, 2007 WL 9650147, at *38 (N.D. Ga. Dec. 24, 2007)(finding that punctuality was an essential function of the job because Plaintiff's supervision of students required that she be present at specific times when the students are present, and the evidence also showed that it was onerous for the school in the face of Plaintiff's tardiness); *see also Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994)(regular and predictable attendance is an essential function of many jobs, and district court correctly

held that plaintiff failed to prove he was a qualified individual because he failed to satisfy the "presence" requirement of a housekeeping aide); *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994)("An employee who cannot meet the attendance requirements of [a university teacher] cannot be considered a 'qualified' individual protected by the ADA").

Plaintiff has unquestionably failed to perform the essential functions of punctuality and regular attendance/physical presence in the classroom, as well as the essential functions of preparing and leaving lesson plans in the classroom and securing a substitute teacher to cover absences; and he is, therefore, not a qualified individual without an accommodation. *Holmes*, 2007 WL 9650147, at *38; *Mills*, 2005 WL 8158200, at *5. "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of [his] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl*, 207 F.3d at 1367; *see also Lucas*, 257 F.3d at 1255–56. When a plaintiff cannot demonstrate a "reasonable accommodation," the employer's delay or failure in investigating a reasonable accommodation is unimportant, and further, an employer has no duty to show undue hardship until the plaintiff first shows that a reasonable accommodation exists. *Earl*, 207 F.3d at 1367. Importantly, "reasonable accommodation" does not mean that an employer is required "to accommodate an employee in any manner in which that employee desires." *Earl*, 207 F.3d at 1367. "This is so because the word 'reasonable' would be rendered superfluous in the ADA if employers were required in every instance

to provide employees 'the maximum accommodation or every conceivable accommodation possible.'" *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). "[U]nder the ADA, a qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'" *Stewart*, 117 F.3d at 1286.

Here, Plaintiff requested nine accommodations: (1) an end-of-day planning period; (2) a co-teacher; (3) breaks; (4) FMLA leave; (5) reminders; (6) additional time to complete tasks and paperwork; (7) alternate ways to clock in; (8) a copier/printer in his classroom; and (9) "one class prep," meaning one class for which to prepare content, not having to switch to a different content. (DSMF ¶¶162-163; Docs. 121-3 at 373; 121-5 at 26). Defendant provided eight accommodations for Plaintiff that were based on the documentation provided by Plaintiff's medical provider: (1) Plaintiff shall be provided with a detailed written list of all duties, tasks, and assignments bi-monthly to ensure that he remains timely with his responsibilities; (2) establish regularly scheduled meetings with superiors/or designee to facilitate clear communication and collaboration to ensure timely completion of tasks assigned; (3) allow Plaintiff additional time to complete tasks with prior approval of supervisor/or designee; (4) provide Plaintiff with desk calendar/organizer for easy access to his daily tasks; (5) Plaintiff shall be assigned a mentor and/or academic coach for the 2019-2020 school year; (6) allow Plaintiff to take frequent breaks; (7) allow Plaintiff to contact Employee Assistance Program regarding solutions to any possible work stress; and (8) on the days when episodes are severe, Plaintiff

41

should be granted intermittent leave through FMLA, following FMLA guidelines, as soon as practical. (DSMF ¶¶172-173, 202-203; PRDF ¶¶172-173; Doc. 121-10 at 7-8).

In his response brief, Plaintiff focuses on his requests for a co-teacher and a planning period at a later time during the day as the "reasonable accommodations" he requested and should have been given.[19] (Doc. 123 at 8-9). Plaintiff also made this same assertion in his email to Robin Goolsby. (DSMF ¶151; PRDF¶151; Docs. 121-3 at 305). But Plaintiff did not meet his burden to show that those two accommodations were reasonable, or that they would allow him to perform the essential functions of his job. *See Earl*, 207 F.3d at 1367; *Lucas*, 257 F.3d at 1255–56. The undisputed facts show that the documentation provided by Plaintiff's medical provider, who was in the best position to assess Plaintiff's limitations, recommended only that Plaintiff needed additional time to complete tasks. (DSMF ¶¶115-116, 152, 159-160; PRDF ¶¶115-116, 152, 159-160); *see Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)("When dealing in the amorphous world of mental disability, we conclude that health-

---

[19] The Court's Scheduling Order expressly states that all facts asserted in the parties' briefs must be supported by citations to the statement(s) of material fact, and briefs that cite directly to the record evidence rather than to the statement(s) of material fact are not acceptable. (Doc. 78 at 7). Here, Plaintiff's brief cites only to the record, not to the statement(s) of material fact, and it also includes additional facts that are not included in the statement(s) of material facts. (Doc. 123). Under LR 56.1(B)(1), the Court will not consider any fact set out only in the brief that is not included in the statement(s) of material facts, nor will the Court consider any facts in the briefs that violate the Court's Order and do not include citations to the statement(s) of material fact. (Doc. 78).

care providers are best positioned to diagnose an employee's disabilities, limitations, and possible accommodations"). The undisputed facts also show that co-teachers are a limited resource; they were only available for classes that included IEP students. (DSMF ¶20; PRDF ¶20).

Further, despite the fact that a co-teacher was not supported by his medical provider's documentation, Plaintiff had a co-teacher for three periods during the first semester. (DSMF ¶¶18-19; PRDF ¶¶18-19). And despite the fact that an end-of-day planning period was not supported by his medical provider's documentation, Defendant nevertheless provided this additional accommodation and changed Plaintiff's schedule so that he had planning during seventh period. (DSMF ¶182; PRDF ¶182; Doc. 121-10 at 4, ¶13). But the evidence shows that neither accommodation enabled Plaintiff to perform the essential functions of punctuality and regular attendance/physical presence in the classroom. The time clock report for the Spring 2019 semester showed that Plaintiff clocked in only 22 times, all of which were long after 7:40 a.m., and he clocked out only once. (DSMF ¶¶128, 143; PRDF ¶¶128, 143; Doc. 121-5 at 20). And during the 2019-2020 school year, although Plaintiff's classroom was inside the main school building, not in an outside trailer, Plaintiff continued to clock in late or not at all, and he failed to clock out, as shown by the time clock report for July 29, 2019, through March 11, 2020. (Docs. 121-3 at 504; 121-5 at 55). Between August 26, 2019, the date Plaintiff returned to work from FMLA leave, and March 11, 2020, Plaintiff clocked in only 65 times, clocked in by 7:40 a.m. only 21 times, and he clocked out only once. (*Id.*). Plaintiff also regularly failed

43

to properly report absences, secure substitute teachers to cover his absences to insure that students were not unsupervised, or provide lesson plans for the substitutes or co-workers that covered his classes. (DSMF ¶¶59-60, 64, 66-67, 78-79, 92-95, 111, 122-124, 126, 128-129, 131, 135-136, 143, 146-147, 213-215, 218-219, 221, 224-225, 259; PRDF ¶¶59-60, 64, 66-67, 78-79, 92-94, 111, 123, 131, 136, 213-215, 218-219, 224-225, 259; Doc. 121-8 at 7, ¶26).

Because Plaintiff's requested accommodations were not reasonable, and also because, even with reasonable accommodations, Plaintiff could not perform the essential functions of his job, he is not a "qualified individual" under the ADA. *Earl*, 207 F.3d at 1367; *Holmes*, 2007 WL 9650147, at \*39; *Mills*, 2005 WL 8158200, at \*5.

### (ii)    Subjected to Unlawful Discrimination—Prong Three

"[A]n employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly*, 492 F.3d at 1262; *Lucas*, 257 F.3d at 1255. There is no additional burden to prove disparate treatment. *Holly*, 492 F.3d at 1262. Thus, Plaintiff need not show that Defendant treated non-disabled co-workers differently, nor is there any subsequent burden for Defendant to show a legitimate non-discriminatory reason for terminating Plaintiff, or for Plaintiff to show that the reasons were pretextual. *Holly*, 492 F.3d at 1262. In other words, unlike race and sex employment discrimination cases, Defendant is not insulated from liability under the ADA by treating its non-disabled employees exactly the same as its

disabled employees. *Holly*, 492 F.3d at 1262. "[T]he very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances—namely, when different treatment would allow a disabled individual to perform the essential functions of his position by accommodating his disability without posing an undue hardship on the employer." *Holly*, 492 F.3d at 1263. "Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement." *Holly*, 492 F.3d at 1263 (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397-98 (2002)).

The only question here is whether Defendant discriminated against Plaintiff by failing to reasonably accommodate his disability.[20] *Holly*, 492 F.3d at 1263. As addressed above, it did not. *See Supra*, Section IV(A)(i). Defendant provided reasonable accommodations for Plaintiff that were based on the documentation provided by Plaintiff's medical provider. (DSMF ¶¶172-173, 202-203; PRDF ¶¶172-173; Doc. 121-10 at 7-8). Plaintiff's requests for a co-teacher and an end-of-day planning period were not supported by the documentation provided by Plaintiff's medical provider, nor did they enable Plaintiff to perform the essential functions of his position—punctuality and

---

[20]To the extent count one asserts wrongful termination, as well as a failure to accommodate, as discussed above, the District Judge previously dismissed any claim for wrongful termination based on disability discrimination for want of exhaustion. (Docs. 70; 72). Neither party objected prior to the District Judge's adoption of the Report and Recommendation, (Doc. 72 at 5); nor did either party seek reconsideration of the final order on any valid ground. (*See* Dkt.). This Court, therefore, will not revisit that already-decided issue.

regular attendance/physical presence in the classroom, securing a substitute teacher to cover absences, and providing lesson plans—and accordingly, they were not reasonable. *See Morris-Huse v. GEICO*, 748 F. App'x 264, 267 (11th Cir. 2018) (accommodations offered by employer were reasonable because they addressed the limitations identified by plaintiff's physician in a manner that allowed her to continue to perform the essential functions of her position; employer was not required to provide her with the accommodations of her choosing); *Holly*, 492 F.3d at 1262 n.16 (because the ADA does not require an employer to eliminate essential functions of a job, "an accommodation that does not enable the employee to perform an essential function of his position is facially unreasonable and is not required by the ADA").

Further, Plaintiff has not identified a "reasonable accommodation" that addresses the unpredictable and unscheduled nature of Plaintiff's absences, that does not place undue hardship on Defendant. *See Jackson,* 22 F.3d at 279. Under the ADA, "undue hardship" is "an action requiring significant difficulty or expense" when considered along with:

> (1) the nature and cost of the reasonable accommodation;
>
> (2) the overall financial resources and number of employees of the affected facility, and the effect that the reasonable accommodation would have on the facility's expenses and resources or other impacts on the operation of such facilities;
>
> (3) the employer's overall financial resources, number and type of facilities, and number of employees; and

> (4) the type of operation run by the employer, 'including the composition, structure, and functions of the workforce' as well as 'the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question' to the employer.

*Davis v. Columbus Consol. Gov't*, 826 F. App'x 890, 893 (11th Cir. 2020). In other words, the impact of the employee's proposed accommodation(s) must be assessed "in the context of the particular [employer's] operations." *Davis*, 826 F. App'x at 893. "Undue hardship 'is a complete defense to ADA liability.'" *Davis*, 826 F. App'x at 893 (citing *EEOC v. St. Joseph's Hosp. Inc.*, 842 F.3d 1333, 1349 (11th Cir. 2016)).

Here, there does not appear to be a reasonable accommodation, or at least Plaintiff has not identified one, that addresses the unpredictable and unscheduled nature of his absences. In the context of Plaintiff's particular job as a teacher, requiring accommodation of such unpredictable and unscheduled absences places undue hardship on Defendant to make last-minute provisions for Plaintiff's classes to be covered by someone else. *Jackson*, 22 F.3d at 279 (requiring employer to accommodate plaintiff's numerous and unpredictable absences would place upon it "the burden of making last-minute provisions for [plaintiff's] work to be done by someone else. Such a requirement would place an undue hardship on the agency"); *Brown v. McHugh*, No. 1:09-CV-0214-RLV-SSC, 2011 WL 13168836, at *30 (N.D. Ga. Aug. 31, 2011), report and recommendation adopted, No. 1:09-CV-0214-RLV, 2011 WL 13176761 (N.D. Ga. Sept. 28, 2011)(finding that there was "no way to accommodate the unpredictable nature of plaintiff's absences, and that "the burden that such accommodation would place on Defendant is certainly an 'undue hardship'").

47

Plaintiff is not a "qualified individual," and he also was not subjected to unlawful discrimination; thus, he cannot establish a prima facie case under the ADA for a failure to accommodate, and judgment as a matter of law is appropriate. *Holly*, 492 F.3d at 1256-63; *Mills*, 2005 WL 8158200, at *5 (holding that because physical presence is an essential function of the job of a teacher, and plaintiff advanced no accommodation that could make her "qualified" without being physically present at school, plaintiff failed to establish a prima facie case of discrimination). Accordingly, the Court **RECOMMENDS** that Defendant's Amended Motion for Summary Judgment, (Doc. 121), be **GRANTED** as to Count One.

### B.    Count Two—ADA Retaliation

In count two of the complaint, Plaintiff alleges that Defendant retaliated against Plaintiff, in violation of the ADA—specifically, that Plaintiff engaged in statutorily protected activity by reporting, complaining of and opposing Defendant's discriminatory practices and treatment, which resulted in Plaintiff suffering adverse employment action. (Doc. 56 at 12-14, ¶¶65-72). "An employer may not retaliate against an employee for opposing any employment practice made unlawful by the ADA." *Branscomb v. Sec'y of Navy*, 461 F. App'x 901, 905 (11th Cir. 2012). To establish a prima facie case under the ADA for retaliation, Plaintiff must show that: "(1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression." *Lucas*, 257 F.3d at 1260; *Satchel v. Sch. Bd. of Hillsborough Cnty.*, 251 F. App'x 626, 629 (11th

48

Cir. 2007). Once a plaintiff establishes a prima facie case, an inference of discrimination is raised, and the burden shifts to the defendant/employer, who may rebut that inference by providing a legitimate, non-discriminatory/non-retaliatory reason for the challenged employment action. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003); *Satchel*, 251 F. App'x at 629 (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). If the defendant does so, then the presumption of discrimination is eliminated, and the plaintiff must show that the defendant's nondiscriminatory reason is a pretext for prohibited retaliatory conduct. *Raytheon*, 540 U.S. at 49 n.3; *Satchel*, 251 F. App'x at 629; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Here, Plaintiff cannot establish a prima facie case under the ADA for retaliation. For the first prong, a plaintiff engages in a "statutorily protected activity" only by opposing an employment practice that is at least facially actionable under the relevant statute—here, the ADA. *Branscomb*, 461 F. App'x at 906; 42 U.SC. §12203(a). The undisputed facts show that the statutorily protected activity Plaintiff engaged in that allegedly subjected him to retaliation in violation of the ADA included: (1) filing a complaint with the Office of Audit Compliance on August 14, 2019, alleging that his wearing a hat during class was an exercise of his First Amendment right of expression, (DSMF ¶252; PRDF ¶252; Docs. 121-3 at 170:16-25–171:1-21; 121-3 at 454-456); (2) filing a complaint with the Georgia Department of Education on October 25, 2019, alleging that he was not certified to teach his sixth period coordinate algebra class, which

included several IEP students, (DSMF ¶250; PRDF ¶250; Doc 121-3 at 129:23-25–130:1-3); (3) filing a FMLA complaint with the Department of Labor on November 24, 2019, alleging that he was not reinstated back to his original teaching position after taking FMLA leave, (DSMF ¶251; PRDF ¶251; Doc. 121-3 at 450-453); and (4) filing complaints with the District against Dr. Parker on February 17, 2020, and March 13, 2020, alleging that Dr. Parker provided false information to Plaintiff about his PDP.[21] (DSMF ¶¶253-254; PRDF ¶¶253-254). The Court notes, however, that in his response brief, taking FMLA leave is the only protected activity that Plaintiff argues subjected him to retaliation. (Doc. 123 at 14-17).

None of these actions are "statutorily protected activity" under the ADA, as they do not oppose practices that are unlawful under the ADA.[22] *See Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005)(complaints about issues with co-workers did not qualify as statutorily protected activity under Title VII); *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012)("In order for Smith's complaints to constitute protected activity [under the ADEA],

---

[21] Defendant included "Plaintiff relates how the Principal at Cedar Grove High School told him that he 'couldn't touch' him," as a protected activity asserted by Plaintiff, which Plaintiff did not dispute, (DSMF ¶255; PRDF ¶255; Doc. 121-1 at 25), but it is not clear to the Court how a statement made to Plaintiff by someone else, even assuming its truth, is a protected activity engaged in by Plaintiff.

[22] Plaintiff's FMLA complaint qualifies as statutorily protected activity under the FMLA, and is discussed below in the section addressing Plaintiff's count four FMLA retaliation claim.

they must include an objection to discrimination on the basis of age"). The only apparent "statutorily protected activity" under the ADA that Plaintiff engaged in is Plaintiff's request for accommodations. *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). Plaintiff did not assert that the allegedly unlawful retaliation he experienced was a result of his accommodation request, however, which is likely because he cannot establish the second or third required prongs based on that protected activity. For the second prong, "[a]n employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas*, 257 F.3d at 1261. "Negative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA." *Lucas*, 257 F.3d at 1261. And for the third prong, a showing of "but-for causation" is required. *Frazier-White*, 818 F.3d at 1258. A plaintiff satisfies the third prong if he provides sufficient evidence that there was a "close temporal proximity" between knowledge of the statutorily protected activity and the adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). A "close temporal proximity" is sufficient circumstantial evidence of a causal link for purposes of establishing a prima facie case, but the Supreme Court has held that the temporal proximity must be "very close," and it cited with approval decisions holding that a three or four month disparity was insufficient. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Higdon*, 393 F.3d at 1220.

Here, the undisputed facts show that Plaintiff first requested an accommodation on January 25, 2019, during his  meeting with Dr. Parker and

51

Dr. Aarestad, and he made an official request for accommodation on March 12, 2019.[23] (DSMF ¶¶102-105, 148-158; PRDF ¶¶102-105, 148-158). To the extent that Plaintiff asserts that negative evaluations and his removal as head coach of the girls' track team were adverse actions, (Doc. 123 at 14-15), they do not qualify as adverse actions. *See Lucas*, 257 F.3d at 1261. It is undisputed that Plaintiff's salary and benefits were not impacted by his PDP or evaluations, and also that he remained head coach of the boys' track team, so he continued to receive his additional monetary supplement; he never received any additional supplement for coaching the girls' team. (DSMF ¶¶21-27, 97, 113; PRDF ¶¶21-27, 97, 113). Plaintiff was notified on May 8, 2020, that his contract would not be renewed for the 2020-2021 school year, and his employment with the District would terminate on May 22, 2020. (DSMF ¶230; PRDF ¶230; Doc. 121-5 at 61). But Plaintiff cannot show the required causal link between that adverse action and his request for an accommodation, which occurred over one year before. *See Clark Cnty. Sch. Dist.*, 532 U.S. at 273; *Higdon*, 393 F.3d at 1220. And indeed, on April 26, 2019, which was in between his request for accommodation (Jan-March 2019), and his ultimate termination (May 22, 2020), Plaintiff received a renewed contract for the 2019-2020 school year. (DSMF ¶145; PRDF ¶145; Doc. 121-5 at 21-22).

---

[23] As stated above, Plaintiff did not assert that the allegedly unlawful retaliation he experienced was a result of his accommodation request, but in an effort to view the evidence and facts in the light most favorable to the Plaintiff, the Court addresses the only apparent "statutorily protected activity" under the ADA in which Plaintiff engaged.

Plaintiff cannot establish a prima facie case of retaliation in violation of the ADA, and judgment as a matter of law is, therefore, appropriate. Accordingly, the Court **RECOMMENDS** that Defendant's Amended Motion for Summary Judgment, (Doc. 121), be **GRANTED** as to Count Two.

### C.   Count Three—FMLA Interference

In count three of the complaint, Plaintiff alleges that Defendant violated the FMLA by interfering with Plaintiff's FMLA rights—specifically that, Defendant "interfered with, restrained and/or denied the exercise or attempt to exercise by Plaintiff" his rights under the FMLA, which resulted in Plaintiff's termination shortly after he returned from FMLA leave. (Doc. 56 at 14-15, ¶¶73-84). The substantive rights granted to eligible employees under the FMLA include "12 workweeks of leave during any 12–month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee"; and also include the right following the FMLA leave "to be restored by the employer to the position of employment held by the employee when the leave commenced or to an equivalent position." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)(citing 29 U.S.C. §§2612(a)(1) and 2614(a)(1))(internal quotations omitted; alterations in original). "The FMLA creates two types of claims: (1) interference claims, in which an employee asserts that [his] employer denied or otherwise interfered with [his] substantive rights under the Act; and (2) retaliation claims, in which an employee asserts that [his] employer discriminated against [him] because [he] engaged in activity

53

protected by the Act." *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 902 (11th Cir. 2014). To state a claim of interference with a substantive right under the FMLA, Plaintiff "need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206–08 (11th Cir. 2001). And unlike a retaliation claim, which requires a showing that the employer intentionally discriminated against Plaintiff in the form of an adverse employment action for having exercised an FMLA right, when bringing an interference claim, the employer's motives are irrelevant. *Strickland*, 239 F.3d at 1207-1208.

"Interfering with" the exercise of FMLA rights includes both "refusing to authorize FMLA leave. . . [and] discouraging an employee from using such leave." *Howard v. Metro. Atlanta Rapid Transit Auth.*, No. 1:14-CV-03667-LMM-AJB, 2017 WL 8186848, at *3 (N.D. Ga. July 28, 2017)(citing 29 C.F.R. §825.220(b); alterations in original), report and recommendation adopted, No. 1:14-CV-03667-LMM-AJB, 2017 WL 8217516 (N.D. Ga. Sept. 8, 2017). There are also at least two alternate or separate theories of recovery for FMLA interference claims: entitlement/interference and reinstatement. *Howard*, 2017 WL 8186848, at *3. "[A]n employee returning from covered leave is entitled to be restored to his former position or its equivalent"; but this right is not absolute. *Strickland*, 239 F.3d at 1208. An employer can deny the right to reinstatement if it can demonstrate that it would have terminated the employee had he not been on FMLA leave. *Strickland*, 239 F.3d at 1208. "In other words, if an employer can

54

show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable." *Strickland*, 239 F.3d at 1208. Although a causal nexus is not an element of an interference claim, the employer can raise this lack of causation as an affirmative defense to liability. *Spakes v. Broward Cnty. Sheriff's Off.*, 631 F.3d 1307, 1309 (11th Cir. 2011).

Here, Plaintiff first applied for FMLA leave on July 25, 2019, requesting leave from July 29, 2019, through September 29, 2019. (DSMF ¶¶165-167; PRDF ¶¶165-167; Doc 121-3 at 352). Plaintiff's FMLA request was approved, to begin August 6, 2019, and end August 30, 2019, with a return to work date of September 3, 2019. (DSMF ¶169; PRDF ¶169; Doc. 121-8 at 77). But on August 22, 2019, Plaintiff submitted paperwork indicating that he was able to return to work on Monday, August 26, 2019, and he returned to work on that date. (DSMF ¶¶170-171; PRDF ¶¶170-171; Doc. 121-8 at 79). When Plaintiff returned to work early, on August 26, 2019, the administration was unprepared for his return, as they believed he would be out until September 2, 2019. (DSMF ¶192; PRDF ¶192). But after some adjusting, Plaintiff was assigned to teach analytic geometry during first and sixth periods; coordinate algebra during second, third and fifth periods; and he had planning during fourth and seventh periods. (DSMF ¶193; PRDF ¶193). Thus, the undisputed facts show both that Plaintiff's leave was granted, and that he was reinstated to his teaching position upon his return. Even though he was assigned different classes, he was returned to an "equivalent" position. Plaintiff, therefore, has failed to establish a prima facie case of FMLA interference for his first FMLA leave.

On March 23, 2020, Plaintiff submitted paperwork, including a certification from his healthcare provider, for retroactive intermittent FMLA leave for the dates that he was absent during the 2019-2020 school year, and on March 24, 2020, the leave request was approved. (DSMF ¶¶226-227; PRDF ¶¶226-227; Doc. 121-5 at 56-59). One month later, on April 24, 2020, Dr. Parker gave a "non-renewal presentation" to the contract reviewing committee of District representatives, recommending that Plaintiff not receive a contract for the 2020-2021 school year. (DSMF ¶229; PRDF ¶229; Doc. 121-8 at 92-112). And Plaintiff was notified on May 8, 2020, that the Dekalb County School District would not renew his contract; thus, his employment with the District would terminate on May 22, 2020. (DSMF ¶230; PRDF ¶230; Doc. 121-5 at 61). Plaintiff, therefore, has established a prima facie case of interference—not being reinstated to his position or an equivalent position—for his second FMLA leave. *See Higdon*, 393 F.3d at 1220 (a period "as much as one month" between a protected activity and an adverse action is "not too protracted" to support a causal connection between the two).

Defendant raises the lack of causation affirmative defense, asserting that it terminated Plaintiff's employment for legitimate, non-discriminatory reasons—namely, Plaintiff's numerous documented performance problems throughout 2018-2020, as both teacher and track coach. (Docs. 121-1 at 23, 27-28; 125 at 13-14). Plaintiff claims pretext, asserting that Defendant failed to clearly and consistently articulate the reasons for his termination, and also that the close temporal proximity between his FMLA leave and his termination is

evidence of pretext sufficient to withstand summary judgment. (Doc. 123 at 10, 16-17).

To establish pretext, and avoid summary judgment, Plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). "A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks*, 446 F.3d at 1163 (emphasis in original; internal quotation omitted)(citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). When the burden shifts to Plaintiff to show pretext, he must "meet [the proffered] reason head on and rebut it." *Brooks*, 446 F.3d at 1163 (alteration in original). Plaintiff "cannot show that [Defendant's] proffered reasons for terminating him were pretextual simply by 'quarreling with the wisdom' of those reasons." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017)(citing *Brooks*, 446 F.3d at 1163). A court may not second-guess the wisdom of a defendant's business decisions, or sit as a "super-personnel department." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) ("It is by now axiomatic that we cannot second-guess the business decisions of an employer"); *Howard*, 2017 WL 8186848, at *4. "[Plaintiff] may, however, establish pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Jones*, 854 F.3d at 1274.

57

Here, Plaintiff has not rebutted Defendant's legitimate, non-discriminatory reasons for terminating him—namely, his numerous performance problems throughout 2018-2020, as both teacher and track coach, which are supported by the evidence. (Docs. 121-1 at 27-28; 125 at 13-14; *see also* DSMF ¶¶51-55, 60, 64-71, 76-79, 95, 111, 122-124, 126, 128-133, 135-136, 143-144, 146-147, 209, 212-219, 221, 224-225, 259; PRDF ¶¶51-55, 60, 64-71, 76-79, 95, 111, 122-124, 126, 128-133, 136, 143-144, 209, 212-219, 224-225, 259; Docs. 121-6 at 7-9, ¶¶30, 39; 121-8 at 4, 8, ¶¶16, 30). Plaintiff cites to no specific or compelling "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action," and the Court will not otherwise second-guess the wisdom of Defendant's employment decision. (Doc. 123 at 10, 16-17); *Jones*, 854 F.3d at 1274; *Rowell*, 433 F.3d at 798; *Howard*, 2017 WL 8186848, at *4-6.

Accordingly, the Court **RECOMMENDS** that Defendant's Amended Motion for Summary Judgment, (Doc. 121), be **GRANTED** as to Count Three.

### D.    Count Four—FMLA Retaliation

In count four of the complaint, Plaintiff alleges that Defendant retaliated against Plaintiff for exercising his FMLA rights—specifically that, Plaintiff engaged in statutorily protected activity by taking FMLA leave, which resulted in Plaintiff suffering adverse employment action. (Doc. 56 at 16-17,¶¶85-93). Similar to an ADA retaliation claim, to establish a prima facie case under the FMLA for retaliation, Plaintiff must show that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the

58

decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207; *Earl*, 207 F.3d at 1367. And the same burden-shifting framework is applied. That is, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the inference of discrimination by providing a legitimate, non-discriminatory/non-retaliatory reason for the challenged employment action, and if the defendant does so, the plaintiff must show that the defendant's nondiscriminatory reason is a pretext. *Strickland*, 239 F.3d at 1207 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Here, similar to his FMLA interference claim, Plaintiff has established a prima facie case of retaliation for his second FMLA leave. Plaintiff engaged in a statutorily protected activity—taking FMLA leave;[24] he suffered an adverse employment action—termination; and there was only one month between the protected activity and the adverse action, which is "not too protracted" to support a causal connection between the two. *Higdon*, 393 F.3d at 1220. That is, Plaintiff submitted paperwork, including a certification from his healthcare provider, on March 23, 2020, for retroactive intermittent FMLA leave for the

---

[24] Plaintiff also filed a complaint with the Department of Labor on November 24, 2019, alleging that he was not reinstated back to his original teaching position after taking his first FMLA leave. (DSMF ¶¶251, 258; PRDF ¶¶251, 258; Docs. 121-3 at 450-453; 121-11 at 1-6). Filing the complaint is a statutorily protected activity under the FMLA, but similar to his interference claim, Plaintiff cannot show a causal connection between the filing of the FMLA complaint on November 24, 2019, and the decision five to six months later to terminate his employment. *See Supra*, Section IV(C). The undisputed facts show that Plaintiff's first FMLA leave was granted, and he was reinstated upon his return from that leave. *Id.*

dates that he was absent during the 2019-2020 school year, which was approved on March 24, 2020, and one month later, on April 24, 2020, Dr. Parker gave a "non-renewal presentation" to the contract reviewing committee of District representatives, recommending that Plaintiff not receive a contract for the 2020-2021 school year. (DSMF ¶¶226-227, 229; PRDF ¶¶226-227, 229; Docs. 121-5 at 56-59; 121-8 at 92-112); *see also Supra*, Section IV(C); *Higdon*, 393 F.3d at 1220.

But same as the interference claim, Defendant asserts that it terminated Plaintiff's employment for legitimate, non-discriminatory reasons—namely, Plaintiff's numerous documented performance problems throughout 2018-2020, as both teacher and track coach—and Plaintiff claims pretext. (Docs. 121-1 at 23, 27-28; 123 at 10, 16-17; 125 at 13-14). For the same reasons addressed at length above for the interference claim, Plaintiff has not rebutted Defendant's legitimate, non-discriminatory reasons for terminating him, which are supported by the evidence. *See Supra*, Section IV(C); (DSMF ¶¶51-55, 60, 64-71, 76-79, 95, 111, 122-124, 126, 128-133, 135-136, 143-144, 146-147, 209, 212-219, 221, 224-225, 259; PRDF ¶¶51-55, 60, 64-71, 76-79, 95, 111, 122-124, 126, 128-133, 136, 143-144, 209, 212-219, 224-225, 259; Docs. 121-6 at 7-9, ¶¶30, 39; 121-8 at 4, 8, ¶¶16, 30). Plaintiff cites to no specific or compelling "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action," and the Court will not otherwise second-guess the wisdom of Defendant's employment decision. (Doc. 123 at 10, 16-17); *Jones*, 854 F.3d at 1274; *Rowell*, 433 F.3d at 798; *Howard*, 2017 WL 8186848, at *4-6.

60

Accordingly, the Court **RECOMMENDS** that Defendant's Amended Motion for Summary Judgment, (Doc. 121), be **GRANTED** as to Count Four.

## V.  <u>CONCLUSION</u>

The Court **RECOMMENDS** that Defendant's Motion for Summary Judgment, (Doc. 100), be **DENIED AS MOOT** because Defendant, with the Court's permission, later filed an amended version of the same motion. (Docs. 116; 118). And for the reasons discussed above, the Court further **RECOMMENDS** that Defendant's Amended Motion for Summary Judgment, (Doc. 121), be **GRANTED**.

As all matters referred to the undersigned have been ruled upon, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned Magistrate Judge.

**SO RECOMMENDED and DIRECTED** this 8th day of November, 2022.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE